IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 5, 2023

**STATE OF TENNESSEE v. WILLIAM FLYNN**

**Appeal from the Criminal Court for Shelby County**
**No. 18-05196         Jennifer J. Mitchell, Judge**

———————————————

**No. W2023-00184-CCA-R3-CD**

———————————————

A Shelby County jury convicted the Defendant, William Flynn, of first degree premeditated murder, first degree felony murder, and aggravated assault in concert. For these convictions, the trial court imposed an effective life sentence. On appeal, the Defendant challenges the sufficiency of the evidence and the jury instructions. After review, we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and MATTHEW J. WILSON, JJ., joined.

Harry E. Sayle, III, Assistant District Public Defender (on appeal); Lauren Pasley (at trial), Memphis, Tennessee, for the appellant, William Flynn.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Rinard, Assistant Attorney General; Steven J. Mulroy, District Attorney General; and Michael R. McCusker and Luis Montesi, III, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the Defendant's shooting the victim, Donnell Love ("victim") and then stealing a bag from the victim's room. For his role in these offenses, a Shelby County grand jury indicted the Defendant and two co-defendants, Christopher Mabry and Kevion Burks, for first degree premeditated murder of Donnell Love, first degree felony murder of Donnell Love, and aggravated assault in concert of Tiffany Loving. The Defendant's case proceeded to trial, during which the parties presented the following evidence.

Tiffany Loving had been dating the victim for about a year but had known him for over ten years at the time of his death. In February 2017, Ms. Loving and the victim shared a room ("Room 121") at the Governor's Inn, in Shelby County, Tennessee. The couple had resided there for approximately six months, and Ms. Loving had recently rented an additional room on the same hallway as Room 121.

Ms. Loving recounted the events of February 12, 2017, leading up to the victim's death. The week before his death, three men had robbed the victim in Room 121. The men had shot the victim in the buttocks with a shotgun and then fled from the hotel room. Ms. Loving urged the victim to seek treatment at the hospital, but he refused. Instead, Ms. Loving treated the victim's wound. On February 11, 2017, the day before the shooting in this case, the victim passed out, and Ms. Loving took him to the hospital where medical personnel gave him antibiotics. Ms. Loving confirmed that both the Defendant, whom she knew as "Jap," and his girlfriend who also resided at the Governor's Inn, Carmen Confer, knew of this prior robbery and shooting.

The following day, February 12, 2017, Ms. Loving was at the hotel with the victim and then left with a friend to get food. While she was away, the Defendant called her. The Defendant claimed that he had paid $10 for drugs but then never received "the product." The Defendant stated that there was a white man in Room 121 who took the Defendant's ten dollars. Ms. Loving told the Defendant she was not at the hotel but would return and speak with the victim about it.

When Ms. Loving arrived at the hotel, she saw the Defendant and two other men standing in the "common stairwell" located directly across from Room 121. Ms. Loving recognized one of the two men with the Defendant as Christopher Mabry. Ms. Loving stated that when she saw the Defendant she thought, "Hurry up and get in the room and shut the door," explaining that her reaction was based in part upon the previous robbery.

Ms. Loving entered Room 121 quickly, closing the door behind her, and found the victim in the room, lying on the bed. She placed her phone call with the Defendant on speaker phone and asked the victim about the Defendant's claim that the victim was "supposed to be serving . . . the white guy took the money, but [the victim] didn't give them the product." The victim seemed confused but took the phone call with the Defendant and stated, "I ain't got time dealing with this sh*t, I'm fixin' to give you the money, how much do you say I owe you[?]" The victim gave Ms. Loving money to give to the Defendant to resolve the complaint. Ms. Loving opened the door to the room to give the Defendant the money, and the Defendant pushed the door open and Ms. Loving to the side while holding a gun to her head. The victim was standing behind Ms. Loving, and the Defendant fired his gun at the victim multiple times. The victim fell to his knees and then sat up against the wall.

The Defendant immediately began demanding money, and Ms. Loving, terrified, began screaming, "[C]an I help him[?] [Y]'all can take whatever you want I don't care[,] I just want to help him." Another man, wearing a mask and black hoodie, stood at the end of the bed while Ms. Loving continued to plead with the Defendant to allow her to help the victim. The Defendant demanded that she "give it to them" or he would shoot her too. Ms. Loving grabbed a black bag that was lying beside the bed and handed it to the man standing at the end of the bed. Upon receipt of the bag, the Defendant and the masked man left, and Ms. Loving began administering CPR on the victim.

That night, Ms. Loving went with police officers to the precinct where she identified the Defendant in a photographic lineup. In another photographic lineup, Ms. Loving identified Christopher Mabry, who she had seen standing in the stairwell before the shooting. Mr. Mabry did not enter the room during or after the shooting, but she confirmed that he was with the Defendant before the shooting.

Ms. Loving recalled that when she had arrived at Room 121 just before the shooting, a "homeless guy" and "a black guy" were in the room with the victim. The homeless man, who was Caucasian, fled when the shooting began. She had seen these two men before, but she did not know their names.

Ms. Loving identified the Defendant in a photograph in which he was wearing black pants, white gym shoes, a white t-shirt, and a light gray hoodie. This clothing was consistent with what he wore when he shot the victim. The photograph was taken from surveillance footage police obtained from Jack Pirtle's ("Jack Pirtle's"), a business near the hotel on the night of the shooting.

During cross-examination, Ms. Loving stated that the Defendant paid for both hotel rooms, Room 121 and the additional room she had alone. Ms. Loving said that she sold drugs for income and used drugs recreationally; however, she did not buy drugs from the victim. Ms. Loving used crack cocaine, heroin, and marijuana. She confirmed that she had used drugs on February 12, 2017, and that she had likely used heroin and crack on that day. She reiterated that she did not know the two men who were in Room 121 when she came back from getting food, but she assumed that the Defendant was selling the men drugs.

Memphis Police Department ("MPD") Officer George King testified that while assigned to the Mt. Moriah precinct, he frequently responded to the Governor's Inn. He described it as a "high crime" establishment. At a little after 10:00 p.m. on February 12, 2017, Officer King responded to the Governor's Inn for a report of a shooting. He estimated that he arrived at approximately 10:15 p.m. and found the victim lying on the

floor "at the front of the room." Officer King escorted Ms. Loving out of the room and "secured" her in his squad car. He described Ms. Loving as "upset," "excited," and "talking a lot." She immediately identified "Jap" as the shooter. Police searched the third floor of the hotel and were unable to locate the Defendant.

On cross-examination, Officer King testified that, based on Ms. Loving's demeanor, he did not believe she was under the influence. He believed she was upset by the circumstances.

MPD Sergeant Daniel Arrington obtained surveillance video footage from Jack Pirtle's located near the Governor's Inn. The footage was recorded at 11:06 p.m. on February 12, 2017, shortly after the shooting. The video showed the Defendant and one of his co-defendants, Kevion Banks, talking on the phone and carrying a bag while walking through the parking lot.

MPD Lieutenant Shayne Tarena received the request to respond to Governor's Inn at 11:11 p.m., and he arrived at 11:34 p.m. to process the crime scene. Lieutenant Tarena identified in court a computer-generated sketch of the crime scene that he had created. Inside Room 121, Lieutenant Tarena observed a green, leafy substance that appeared to be marijuana on the bed. He saw a circular defect on the bathroom door that appeared to be an entry and exit hole caused by a projectile. Lieutenant Tarena described Room 121 as "[v]ery cluttered, very unkept, . . . it was nasty." Lieutenant Tarena found a gun in the room, saying:

> The gun was tucked in between the headboard by the mattress of the headboard and the nightstand and it was in a [sic] orange zip-bag and then the gun was in a green bag inside of that. And then, inside of the green bag that it was in, it was inside of, like, a Kroger bag tee-shirt bag, you know plastic tee-shirt bag and the gun was inside of it.

The State offered and the trial court entered photographs of the Cobra semi-automatic gun and the multiple layers of bags. Lieutenant Tarena confirmed that there were no bullets in the gun.

Lieutenant Tarena said that there was a significant amount of coins and cash found in the room. Police recovered $2096.00 in paper money and $826.70 in coins. The paper money was in a blue sack, and the coins were in various plastic containers and Ziploc bags. Police identified four areas of possible blood inside Room 121 and just outside Room 121.

Lieutenant Tarena was also directed to room 353, Carmen Confer's room. In room 353, he found a cell phone and a baggie containing white powder.

- 4 -

On cross-examination, Lieutenant Tarena testified that he also collected a Samsung cell phone found between the victim's legs. After reviewing his report, Lieutenant Tarena clarified that he collected three cell phones, not one, from room 353.

MPD Lieutenant Kevin Baker, the case officer assigned to this case, arrived at the scene at 10:50 p.m. on the night of the shooting. He learned that a witness to the shooting, Ms. Loving, was detained in the backseat of a squad car. The police had also detained another individual who had knowledge about the shooter.

Lieutenant Baker first spoke with Ms. Loving. She relayed the events of the shooting to Lieutenant Baker consistent with her trial testimony. She told him that the Defendant and an unknown Black man rushed in the room as she opened the hotel room door, shot the victim, and then demanded money and drugs. Ms. Loving grabbed a bag and gave it to them, and they fled.

The other individual detained at the scene was Carmen Confer. Ms. Confer resided in room 353 of the hotel, and the Defendant was her boyfriend. Police obtained and executed a search warrant for room 353. Police did not find the Defendant in the room or on the hotel premises that night.

Police transported Ms. Confer and Ms. Loving to the police station and interviewed them both. Lieutenant Baker identified the photographic line-ups shown to Ms. Loving. She identified the Defendant from one of the lineups.

During the interview with Ms. Loving, she indicated that the victim was "a hustler" and sold "dope" out of Room 121. Upon learning this information, Lieutenant Baker's superior officer called Lieutenant Baker, who was still at the crime scene, and asked him to look for drugs or money in Room 121. Upon further investigation, officers found the money earlier testified to and the Cobra pistol. Lieutenant Baker described the location and storage of the pistol consistent with Lieutenant Tarena's testimony.

Lieutenant Baker testified that, due to Jack Pirtle's proximity to the hotel, he sent an officer to Jack Pirtle's to see if the establishment had surveillance cameras. The officer obtained surveillance footage that showed the Defendant and Kevion Burks at 11:06 p.m., shortly after the shooting. Police developed three suspects for the shooting: the Defendant, Christopher Mabry, and Kevion Burks. In March 2017, police showed Ms. Loving two more photographic lineups. She identified Christopher Mabry in one of the lineups, but she was unable to identify Kevion Burks in the other photographic lineup.

The MPD fugitive team looked for the Defendant for two weeks before Lieutenant Baker drafted an arrest warrant. The Defendant was not located for quite some time following the shooting. A criminal investigator for the Shelby County District Attorney General's office, David Sloan, located the Defendant in December 2019, in Austin, Texas. Law enforcement extradited the Defendant to Memphis on February 24, 2020. Mr. Sloan also sought to locate the Defendant's girlfriend, Carmen Confer but was unable to do so.

Marco Ross, the Chief Medical Examiner for the West Tennessee Regional Forensic Center, testified as an expert witness in the field of forensic pathology. Dr. Paul Benson performed an autopsy on the victim's body in February 2017, but he had since moved to Alabama. Dr. Ross had thoroughly reviewed Dr. Benson's findings and agreed with Dr. Benson's conclusions that the cause of death was gunshot wounds, and the manner of death was homicide.

The autopsy revealed both fresh gunshot wounds and healing gunshot wounds. Dr. Ross testified that there was a healing gunshot wound to the victim's buttocks. The wound still contained some type of "pellets." The fresh gunshot wounds were to the victim's left jaw, the right side of the victim's chest, the left upper back, the victim's back left shoulder, the left side of the victim's chest, and the victim's right hand. On the victim's left hand there was an injury described as a "gunshot graze wound."

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder and felony murder of Donnell Love, and aggravated assault in concert of Tiffany Loving. The trial court merged the murder convictions and imposed an effective life sentence. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant attacks the sufficiency of the evidence supporting his convictions and the jury instructions.

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his convictions. He argues that Ms. Loving's testimony was "unreliable" and uncorroborated. He also argues that the State failed to prove felony murder beyond a reasonable doubt because the Defendant's demands for money occurred after the victim was killed. The State responds that there was sufficient evidence to support each of the Defendant's convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate

view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2018). A premeditated killing is one "done after the exercise of reflection and judgment." *Id.* at § 39-13-202(d) (2018). The element of premeditation is a question of fact for the jury. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. *Bland*, 958 S.W.2d at 660.

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." *Id.* § 39-13-202(a)(2) (2018). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103(a) (2018).

A person commits aggravated assault by intentionally, knowingly, or recklessly committing an assault that results in serious bodily injury to another or by intentionally or knowingly committing an assault through the use or display of a deadly weapon. T.C.A. § 39-13-102(a)(1)(A)(i), (iii) (2018). Aggravated assault, as charged herein, is a Class C felony. *Id.* at § 39-13-102(e)(i)(A). Tennessee Code Annotated section 39-12-302 provides that "[a] crime of force or violence committed while acting in concert with two or more other persons shall be classified one classification higher than if it was committed alone."

The question of whether one defendant is acting in concert with another is a question of fact for the jury. *Rice v. State*, 475 S.W.2d 178, 179 (Tenn. Crim. App. 1971). This court has likened "acting in concert" with criminal responsibility in the context of a case involving the commission of a robbery. *State v. Spencer, Baxter, Jr., and Dean*, No. M2016-01219-CCA-R3-CD, 2017 WL 2800147, at *6 (Tenn. Crim. App. June 28, 2017) (citing T.C.A. § 39-11-402(2)) (a defendant "acts in concert with another if the defendant acts 'with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.'"), *perm. app. denied* (Tenn. Nov. 16, 2017).

- 8 -

The evidence, viewed in the light most favorable to the State, showed that the Defendant knew the victim, who dealt drugs out of Room 121, had recently been robbed. The Defendant called Ms. Loving demanding the return of money he had allegedly given for drugs to a "white man" in Room 121. Ms. Loving told the Defendant she would return to the room and speak with the victim about the Defendant's money. Ms. Loving returned to the room and saw the Defendant and two other men standing across from the victim's doorway. Their presence caused her concern. She quickly entered Room 121, closing the door behind her.

Once inside, Ms. Loving gave her phone, which was still connected by phone call to the Defendant, to the victim so the victim could speak with the Defendant. The victim agreed to return the Defendant's money to resolve the issue, and he gave Ms. Loving money to give to the Defendant. As Ms. Loving opened the hotel room door to give the Defendant the money, the Defendant pushed his way in brandishing a gun and fired at the victim multiple times, killing him. The Defendant then refused to allow Ms. Loving to render aid to the victim and demanded that she give him money. A masked man stood at the foot of the bed where Ms. Loving was standing and pleading with the Defendant to allow her to help the victim. She grabbed a black bag, gave it to the masked man, and the two men fled.

This is sufficient evidence upon which a jury could find that the Defendant, with premeditation, set up circumstances to provide entry to a room where he knew there to be drugs and money and then, armed with a weapon, forced entry into the victim's room and fired at the victim's chest multiple times, killing him. This evidence supports a first degree premeditated murder and a felony murder conviction. Immediately after shooting the victim, the Defendant demanded money from Ms. Loving and threatened to kill her too. During these events, the Defendant was with two other men, waiting outside the hotel room when Ms. Loving arrived. One of the two men, who was masked, entered the room with the Defendant and took the victim's black bag before fleeing. This evidence supports the jury's finding that the Defendant acted in concert with Kevion Burks and Christopher Mabry in the commission of an aggravated assault.

The Defendant specifically argues that the evidence is insufficient because the Defendant was dead before the theft occurred. The Tennessee Supreme Court, however, has concluded that the killing may precede the theft, "so long as there is a connection in time, place, and continuity of action." *Buggs*, 995 S.W.2d at 107. This is because "'[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" *State v. Thacker*, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting WHARTON ON HOMICIDE, § 126 (3d ed.) (omission in original)). Proof that such intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the

facts and circumstances. *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973); *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993). In this case, there was sufficient evidence to conclude that the intent to commit the theft was formed before the shooting based upon the circumstances surrounding the offense. The Defendant waited outside the room, forced entry, fired on the victim, and then immediately demanded money while threatening to shoot Ms. Loving too. The Defendant's actions constitute a continuity of action.

As to the Defendant's challenge to Ms. Loving's credibility and the weight of her testimony, "[t]his Court does not reweigh or reevaluate the evidence." *Bland*, 958 S.W.2d at 659. Credibility is determined by the jury and the jury was entitled to credit her testimony. *Id.*

Accordingly, we conclude that there was sufficient evidence from which a rational jury could have concluded that the Defendant intentionally and with premeditation shot and killed the victim in the process of stealing money and that he acted in concert when committing the aggravated assault of Ms. Loving. The Defendant is not entitled to relief as to this issue.

## B. Jury Instruction

In his brief, the Defendant lists as an issue for review, "Whether the trial court erred in instructing the jury on flight?" In the argument section of the brief, however, the Defendant does not address this issue at all. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see* Tenn. R. App. P. 27(a)(7). As a result, we conclude that the Defendant's challenge to the trial court's jury instruction is waived.

## III. Conclusion

Based upon the foregoing, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE